# CASES DETERMINED

IN THE

# SUPREME COURT OF JUDICATURE

OF THE

# STATE OF NEW JERSEY.

## JUNE TERM, 1883.

STATE, EX REL. JOSEPH W. BOWNES, v. FRANCIS C. MEEHAN.

1. The office of the keeper of the jail authorized by the statute to be erected on the county farm in Hudson county is of a public nature, and an intrusion into such office is remediable by an information in the nature of a *quo warranto.*

2. The use of that procedure is extended by the statute of this state to a usurpation of any public office.

3. An outgoing board of chosen freeholders cannot fill an office that will not become vacant during the term of their own official life.

4. If a demurrer be put in to an information, it is not a matter of course for the court to allow it to be withdrawn and a plea to be filed.

5. Where it appears that an intrusion has been consciously wrongful, a part of the judgment will be a fine or a punishment.

On information, &c.

The information was to this effect: that the relator, by virtue of the act approved March 4th, 1863, entitled " An act

189

Bownes v. Meehan.

to authorize the board of chosen freeholders of the county of Hudson to establish a jail and work-house at the county farm in said county," was appointed by the board of chosen freeholders of the said county to the office of jailer or keeper of the jail and work-house at the county farm on the 4th day of September, 1879, and said appointment, being approved by the director at large of said board on the 2d day of October, 1879 ; that the term of said office was fixed by the statute at three years, and until his successor should be appointed ; that after such appointment, he gave bonds and was qualified for said office in the manner provided by the statute, and continued in said office, performing the duties thereof during the said term of three years, to wit, up to the 4th day of September, 1882.

That at the annual spring charter and township election held in said county on the 12th of April, 1881, there were elected to the office of chosen freeholders of such county sixteen members, whose term of office commenced on the 3d day of May, 1881, being elected to hold office till the 2d day of May, 1882 ; and that on the 11th day of April, 1882, at the annual spring and charter election, there were twenty chosen freeholders elected—the number fixed by statute—to hold from the 2d day of May, 1882, to the 3d day of May, 1883.

That the term of office of the relator expired during the term of office of the board elected on the 11th of April, 1882, to wit, on the 4th day of September, 1882, and that there was no vacancy in such office during the term of office of the board whose term ended on the 2d of May, 1882.

That on the 20th of April, 1882, the said board of freeholders appointed, or pretended to appoint, Francis C. Meehan, the respondent, to said office of keeper of said jail, and that the board of freeholders last elected in said county has not appointed to said office, and that said Meehan took forcible possession of said office, notwithstanding the resistance of relator, and that he still continues to hold and enjoy the same.

There was a demurrer to this information

Bownes v. Meehan.

Argued at February Term, 1883, before BEASLEY, CHIEF JUSTICE, and Justices VAN SYCKEL, KNAPP and PARKER.

For the relator, *A. L. McDermott.*

For the respondent, *G. Collins.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. The relator, it is admitted in this record, was duly appointed to the office of keeper of the jail authorized by a special act to be erected and maintained in the county of Hudson, and his complaint is, that having the right to continue in that position until his official successor should have been legally appointed, the respondent ousted him under the pretence of an appointment to the post by the board of freeholders whose term expired on the 2d day of May, 1882. The information shows that the relator's office did not terminate, so as to enable his successor to be chosen, until the 4th day of September, 1882, and it therefore appears that the respondent holds office by virtue of the authority of an outgoing board of freeholders, who undertook to fill an office that did not become vacant during the term of its own official life. Such a course was in direct opposition to the legal rule upon that subject as propounded by this court in the case of *Haight* v. *Love,* 10 *Vroom* 14, 476. And it seems to me that the defence of this conduct on the part of this corporate body is of the flimsiest consistence. It is to the effect that the board which put the respondent into office had the right to hold over until a new board had been legally chosen, and that no such board has as yet been constituted. It is not pretended that this old board did actually continue in possession of its office until the term of the relator had expired; but it is asserted that in law it had the right so to do, on the ground that the new board elected to succeed it in the spring of 1882 had not been chosen from legally constituted voting districts. It is not necessary to explain the situation of the statutes from which the objection thus hinted at has arisen, for it is enough

to say that there is not in the statements of this information the materials requisite for the formation of an intelligent conclusion upon that subject. It may, however, be proper to observe that inasmuch as the new board, whether legally elected or not, was the *de facto* board when the office in question fell in, it is not apparent how the inquiry in this incidental proceeding, with respect to the position of such board as officers *de jure*, is relevant. The well-settled doctrine that a public officer *de facto* will, while clothed with the ostensible attributes and semblances of office, be, in legal contemplation, received as the officer *de jure*, would seem necessarily to carry with it the power to fill such offices as could be filled by him if he were the lawful incumbent; otherwise the inconsistency and confusion would prevail incident to the circumstance that a part of the official power—that is, the power to appoint to official station—would have to be exercised by the officer *de jure*, while the residue of such power would be in the hands of the officer *de facto*. I am not cognizant of any legal principles that will lead to such a state of affairs so inconvenient and impolitic as respects the public. It would seem, therefore, that granting the contention in favor of the legal standing of this outgoing board when it made the appointment of the respondent, there being then no vacancy, such act was void, as such body did not continue in the exercise of its public functions until the office in question fell in, but before that event had yielded up such functions to an adverse board, there was and could be no ratification, either express or implied, of such appointment.

The principal argument addressed to the court in behalf of the respondent, however, was in support of the proposition that the office here in question did not belong to the class that, upon legal principles, is within the protection of a *quo warranto*, or of an information in the nature of such remedy. The assumption underlying this course of reasoning was that the jailer of the work-house on the county farm, in the county of Hudson, is not a public officer, but is the mere servant of the chosen freeholders. But this assumption does not appear

to have, in point of fact, even a plausible basis, for it is repugnant to almost every clause of the statute which creates the office. That act authorizes the board of chosen freeholders to "establish a jail and also a work-house" upon the county farm; to appoint a jailer of such institution by a vote of a majority of all the members of such board, his term being three years and until another be appointed in his stead, being removable by a vote of two-thirds of all the chosen freeholders of the county. He is required to give bond, and the jail thus to be erected is declared to be "a part of the common jail of the county of Hudson." The second section of this law defines the powers of the chosen freeholders and of the jailer to be appointed by them in these words, viz.: "That the custody, full keeping and charge of such jail and workhouse and of the prisoners therein shall not be in the sheriff of the county of Hudson, but shall be in the board of chosen freeholders of that county and in such jailer as they shall appoint for that purpose; and the said board of chosen freeholders and such jailer shall, in the receiving, custody and discharge of prisoners and in their treatment and maintenance, be subject to all laws and regulations to which sheriffs and their jailers are subject, except so far as the same may be changed by the provisions of this act."

By another clause the jailer, it is declared, is "to be master of the said work-house, and, subject to the regulations of the said board, shall have the charge and custody of the person or persons sentenced there to work and labor." A power is also given to him to punish refractory prisoners.

From these citations it will be perceived that the office in question is substantially one well known to the common law, for this officer is a keeper of a common jail. The act, in terms, says that with respect to the custody and treatment and maintenance of prisoners, both he and the chosen freeholders are to be subject to the same laws and regulations to which sheriffs and their jailers are subject. Every power, every responsibility and every function of the office is of a public character, and it is a part of the machinery by which

the criminal law of the state is administered.   It would, indeed, be strange as well as unfortunate if an intruder into such a post as this was irremovable, so far as legal remedies are concerned.   The reasoning most pressed on this subject in the argument at the bar was founded on the circumstance that the incumbent of this office can be removed by a vote of two-thirds of the members of the board of freeholders, and the inference was drawn from this adjustment that as the board could at its will vacate the office and elect a successor, there was no necessity in such a class of cases for resort to the *quo warranto*, and that the right to the remedy was co-extensive merely with the necessity for its application.   But this reasoning is at fault, as it fails to show how an incumbent of this office, after he had been removed by the vote of the freeholders, could be ousted from the possession of his station if he chose to retain it.   Such a recusant incumbent would be a usurper, as this respondent is, and nothing more, and if the latter cannot be expelled from the place into which he has intruded by the present proceeding, neither could the former : so far as relates to legal methods, there would in neither case be a remedy.   There seems to me to be but little plausibility in such a theory.

When we refer to the law on this subject, we find, indeed, some looseness and contrariety in the decisions, but none even of the most unreliable of such cases, and which, it is safe to say, would not be followed at this day, lend any color to the contention under consideration.   The proceeding by information in the nature of *quo warranto*, has, in modern practice, superseded the ancient writ of *quo warranto*, and some doubts seem to have arisen in the minds of the English judges whether the substitute was not to be strictly confined to the uses and objects of the original procedure, and as the latter could be brought only to protect from invasion offices and franchises derived from the crown, the former was sometimes supposed not to be applicable to other purposes.   But even under the stringency of this principle the great weight of authority was in favor of the applicability of the remedy

against usurpers of every office connected with the administration of public justice. An example of this principle is afforded by the case of *Rex* v. *Boyles*, 2 *Ld. Raym.* 1559, which was an information for usurping the office of bailiff of Southwold in Suffolk, and this procedure was sustained against a demurrer, the court saying, " here it is alleged to be a public office and concerns the government of the ville and the administration of public justice." So with respect to many inferior offices, under the prevalence of common law rules, the remedy has been declared to be available, as in case of the bailiff of a court leet, *Rex* v. *Bingham*, 2 *East* 308 ; or of a borough, *Rex* v. *Highmore*, 1 *Dowl. & Ry.* 438 ; of a constable, *Rex* v. *Goudge*, 2 *Str.* 1213 ; of the register of a court of requests, *Rex* v. *Hall*, 1 *Barn. & Cress.* 123.

But the final exposition of this subject by the English courts is to be found in the authoritative case of *Darley* v. *Reg.*, 12 *Cl. & Fin.* 530. The case is one of great consideration, as it was twice argued, and on the latter occasion in the presence of the judges, the only question debated being whether the office of treasurer of the public money of the county of the city of Dublin was an office for which an information in the nature of a *quo warranto* would lie. The conclusion was that the remedy was appropriate to the case, and Chief Justice Tindall, at the conclusion of his opinion, thus carefully defines the general rule on the subject. He says : " And after a consideration of all the cases and *dicta* on this subject, the result appears to be that this proceeding by information in the nature of a *quo warranto* will lie for usurping any office, whether created by charter alone or by the crown, with the consent of parliament, provided the office be of a public nature, and a substantive office, not merely the function or employment of a deputy or servant held at the will and pleasure of others."

It is plain that this definition, which is the reasonable result from common law rules, will vindicate the use of this procedure in the present case, for the office now in question is a substantive office, having an independent existence, being

the creature of the statute, and in all its aspects of a public nature.

But there is another consideration affecting this topic which appears to have escaped the attention of counsel, that is, the regulation of this procedure established by the statutory law of this state. By the act entitled "An act for rendering the proceedings upon information in the nature of a *quo warranto* more speedy and effectual," (*Rev., p.* 905,) the remedy was intended to be put upon a different footing from that which it occupied at common law, as such law was then, in some cases, expounded by the courts. It may be that Judge Paterson, in the exercise of his usual sagacity, was minded, in framing this statute, to remove all doubts and difficulties which existed with respect to the scope and office of this proceeding by information. The act drawn by him is, in the main, a transcript of the statute of 9 *Anne, c.* 20, but that law is expressly restricted to the offices of mayors and other officers of cities and boroughs, and in this important particular the New Jersey statute is not a copy of it. Instead of giving the remedy in a limited class of cases, our act, in this respect, is entirely unrestricted, its language being this : "That in case any person or persons shall usurp, intrude into or unlawfully hold or execute any office or franchise within this state, it shall and may be lawful to and for the attorney-general, with the leave of the Supreme Court, to exhibit one or more information or informations," &c.

If there were, therefore, any doubt upon common law rules in regard to the present topic of discussion, this statutory language, establishing so plainly a rule on the subject, would at once dispel it, for in view of this legislative regulation it would be out of the question for this court to say that the only means by which a usurper of the office of the keeper of a public jail of a county can be ousted is by a breach of the peace. In the case in hand, the proper mode of proceeding is by information.

It remains to consider what disposition should be made of the present case. Should the judgment be final on this de-

murrer in favor of the state; and, in the second place, should a fine, as a part of that judgment, be imposed on the respondent? The statute provides, in case of an intrusion found, that " it shall and may be lawful to and for the said court as well to give judgment of ouster against such person or persons, of and from such office or franchise, as to fine such person or persons respectively for his or their usurping, intruding into or unlawfully holding and executing any such office or franchise."

It is the settled law of this state that usurpers of public offices may, if they receive the emoluments, retain them as their own property, and it is obvious that these profitable usurpations will be numerous unless the tendency to such misconduct shall be restrained by the repressive hand of this court. There is apparently but little, if anything, in the facts of this case, as they are presented to the court, to induce a belief that this usurpation was the result of a mistaken view of the law on the part of the respondent, but before pronouncing judgment, his counsel, if he should desire it, will be heard upon the subject.